1   JONATHAN E. NUECHTERLEIN (General Counsel)
2   BENJAMIN J. THEISMAN
    MIRIAM R. LEDERER
3   FEDERAL TRADE COMMISSION
    600 Pennsylvania Ave., NW, M-8102B
4   Washington, DC 20580
5   Tel: 202-326-2223 (Theisman); 202-326-2975 (Lederer)
    Email: btheisman@ftc.gov; mlederer@ftc.gov
6
7   STACY PROCTER (Local Counsel)
    CA Bar No. 221078, sprocter@ftc.gov
8   FEDERAL TRADE COMMISSION
9   10877 Wilshire Boulevard, Suite 700
    Los Angeles, CA 90024
10  Tel:  310-824-4343; Fax:  310-824-4380
11
12  Attorneys for Plaintiff FTC
13
14              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
15
16
17  FEDERAL TRADE COMMISSION,          Case No. SACV 14 - 00693 JLS (ANx)
        Plaintiff,
18
                                       COMPLAINT FOR
19      v.                             PERMANENT INJUNCTION
20                                     AND OTHER EQUITABLE
    DEBTPRO 123 LLC, a limited liability  RELIEF
21  company,
22
    ALLSTAR PROCESSING CORP., a
23  corporation,
24
    ALLSTAR DEBT RELIEF LLC, a Texas
25  limited liability company,
26
    ALLSTAR DEBT RELIEF LLC, a
27  California limited liability company,
28

                                1

1  REDWAVE MANAGEMENT GROUP,
   INC., a corporation,
2

3  BET COMPANIES, INC., also d/b/a
   DebtPro 123, a corporation,
4

5  and

6
   BRYAN E. TAYLOR, a/k/a B. Edward
7  Taylor, individually and as an officer of
   DEBTPRO 123 LLC, ALLSTAR
8  PROCESSING CORP., ALLSTAR DEBT
9  RELIEF LLC (TX), REDWAVE
   MANAGEMENT GROUP, INC., and BET
10 COMPANIES, INC.,
11

12 RYAN FOLAND, a/k/a R. Eugene Foland,
   individually and as an officer of
13 DEBTPRO 123 LLC, ALLSTAR
14 PROCESSING CORP., ALLSTAR DEBT
   RELIEF LLC (TX), and REDWAVE
15 MANAGEMENT GROUP, INC.,
16

17 STACEY FRION, individually and as an
   officer of REDWAVE MANAGEMENT
18 GROUP, INC.,
19

20 KARA TAYLOR, a/k/a Kara Wilbur, a/k/a
   Kara Lynn, individually and as an officer
21 of DEBTPRO 123 LLC, and REDWAVE
   MANAGEMENT GROUP, INC.,
22

23       Defendants.

24
25       Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:
26       1.      The FTC brings this action under Sections 13(b) and 19 of the Federal
27 Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and 57b, the
28 Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing

                                    2

Act"), 15 U.S.C. §§ 6101-6108, and Section 410(b) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310, and CROA, 15 U.S.C. § 1679 *et seq.*

**JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 1679h(b), 6102(c), and 6105(b).

3.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

**PLAINTIFF**

4.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.  The FTC also enforces CROA, 15 U.S.C. § 1679h(a), which prohibits unfair or deceptive advertising and business practices by credit repair organizations.

5.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, and CROA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and

1    the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A),

2    56(a)(2)(B), 57b, 1679h(b), 6102(c), and 6105(b).

3    **DEFENDANTS**

4    6.    Defendant DebtPro 123 LLC ("DebtPro") is a California limited

5    liability company with its principal place of business at 3972 Barranca Parkway,

6    Suite J-212, Irvine, CA.  DebtPro was organized in or about 2008.  At times

7    material to this Complaint, acting alone or in concert with others, DebtPro has

8    advertised, marketed, distributed, or sold services that purported to resolve

9    consumer debts ("debt resolution programs" or "the program") in this district and

10   throughout the United States.

11   7.    Defendant Allstar Processing Corp. ("Allstar Processing"), formerly

12   known as Hagalean Corporation, is a Wyoming corporation that operated from

13   3972 Barranca Parkway, Suite J-212, Irvine, CA.  Allstar Processing's registered

14   agent, WyomingRegisteredAgent.com, Inc., is located at 2510 Warren Avenue,

15   Suite 3708, Cheyenne, Wyoming.  Allstar Processing also lists this Wyoming

16   address as its principal place of business.  At times material to this Complaint,

17   acting alone or in concert with others, Allstar Processing has advertised, marketed,

18   distributed, or sold debt resolution programs to consumers in this district and

19   throughout the United States.

20   8.    Defendant Allstar Debt Relief LLC ("Allstar Debt (TX)") is a Texas

21   limited liability company whose registered agent for service of process is located at

22   100 Congress Avenue, Suite 200, Austin, TX.  At times material to this Complaint,

23   acting alone or in concert with others, Allstar Debt (TX) has advertised, marketed,

24   distributed, or sold debt resolution programs to consumers in this district and

25   throughout the United States.

26   9.    Defendant Allstar Debt Relief LLC ("Allstar Debt (CA)") is a

27   California limited liability company located at 5620 Paseo Del Norte #127-439,

28   Carlsbad, CA.  At times material to this Complaint, acting alone or in concert with

4

others, Allstar Debt (CA) advertised, marketed, distributed, or sold debt resolution programs to consumers in this district and throughout the United States.

10.    Defendant Redwave Management Group, Inc. ("Redwave") is a Nevada corporation that asserted in its Nevada corporate papers that all of its officers received mail at 3972 Barranca Parkway, Suite J-212, Irvine, CA. At times material to this Complaint, acting alone or in concert with others, Redwave has advertised, marketed, distributed, or sold debt resolution programs to consumers in this district and throughout the United States.

11.    Defendant BET Companies, Inc. ("BET"), also d/b/a Defendant DebtPro, is a California corporation with its principal place of business at 3972 Barranca Parkway, Suite J-212, Irvine, CA. At times material to this Complaint, acting alone or in concert with others, BET, also d/b/a Defendant DebtPro, has advertised, marketed, distributed, or sold debt resolution programs to consumers in this district and throughout the United States.

12.    Defendant Bryan E. Taylor, a/k/a B. Edward Taylor, ("Taylor"), is the Owner and Manager of DebtPro; the Owner, Director, President, Secretary, and Treasurer of Allstar Processing; the Manager and Registered Agent of Allstar Debt (TX); the Agent of Service of Process for Allstar Debt (CA); the Director, President, and Treasurer of Redwave; and the Owner, Director, Chief Executive Officer, Chief Financial Officer, Secretary, and President of BET. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of DebtPro, Allstar Processing, Allstar Debt (TX), Allstar Debt (CA), Redwave, and BET, including the acts and practices set forth in this Complaint. Defendant Taylor, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13.     Defendant Ryan E. Foland, a/k/a R. Eugene Foland, ("Foland"), is the President and Managing Director of DebtPro; the Director of Allstar Processing; the Manager of Allstar Debt (TX); and the Director and President of Redwave.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of DebtPro, Allstar Processing, Allstar Debt (TX), Allstar Debt (CA), Redwave, and BET, including the acts and practices set forth in this Complaint.  Defendant Foland, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.     Defendant Stacey Frion ("Frion"), was the Office Manager of DebtPro and is the Secretary of Redwave.  At times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of DebtPro, Allstar Processing, Allstar Debt (TX), Allstar Debt (CA), Redwave, and BET, including the acts and practices set forth in this Complaint.  Defendant Frion, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15.     Defendant Kara Taylor, a/k/a Kara Wilbur, a/k/a Kara Lynn, ("Kara Taylor") is a Manager of DebtPro and President of Redwave.  At times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of DebtPro, Allstar Processing, Allstar Debt (TX), Allstar Debt (CA), Redwave, and BET, including the acts and practices set forth in this Complaint.  Defendant Kara Taylor, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

6

**COMMON ENTERPRISE**

16.    Defendants DebtPro, Allstar Processing, Allstar Debt (TX), Allstar Debt (CA), Redwave, and BET (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations; that routinely commingled funds via bank transfers and writing checks for expenses on behalf of the others; and that held themselves out to consumers as being the same company.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Taylor and Kara Taylor have also maintained personal bank accounts using the same business address as the Corporate Defendants.  Moreover, Defendants Taylor, Foland, Frion, and Kara Taylor have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

**COMMERCE**

17.    At all times material to this Complaint, Defendants have maintained a substantial course of business in the advertising, marketing, promoting, offering for sale and sale of debt resolution services, in or affecting commerce, including the acts and practices alleged herein, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

18.    Since at least October 1, 2008, Defendants have engaged in a scheme to defraud consumers by marketing, promoting, and/or selling services that purported to resolve consumer debts.  Defendants offered several debt resolution

1  programs that were functionally identical, regardless of the specific Corporate

2  Defendant involved.

3      19.    Defendants promoted and sold their debt resolution programs to

4  consumers via inbound and outbound telemarketing calls, as well as through

5  promotional materials such as Internet websites, videos, telephone scripts, broker

6  kits, affiliate trainings, flyers, and information packets.  Defendants provided these

7  materials to prospective purchasers, as well as to paid third-party sales offices

8  and/or sales representatives ("affiliates").

9      20.    The affiliates signed contracts with Defendants, in which they agreed

10  to sell Defendants' program to the exclusion of any other debt resolution programs.

11  Defendants provided training, telemarketing scripts, informational packets, as well

12  as other marketing materials to the affiliates.  Defendants also gave affiliates

13  access to a centralized consumer records management database.

14      21.    Affiliates used a variety of methods to connect consumers with

15  Defendants, including but not limited to:  speaking with consumers and forwarding

16  their contact information for Defendants to call consumers; disseminating

17  Defendants' promotional materials to consumers and giving them Defendants'

18  phone number; and helping consumers complete and submit Defendants'

19  enrollment forms.

20      22.    Following enrollment, Defendants communicated directly with

21  consumers.  Thereafter, Defendants discouraged their affiliates from continuing to

22  communicate with enrolled consumers about Defendants' program.

23      23.    Regardless of the sales method, Defendants promised to provide the

24  relevant services, including, among other things, negotiating settlements with

25  consumers' creditors, providing customer service, and administering customer

26  accounts.

27

28

*Defendants' Pitch*

24.    Defendants represented that their debt resolution program would completely resolve consumers' credit card and other unsecured debts (including department store accounts, personal loans, medical bills, student loans, and accounts with collection agencies).  Defendants promised to resolve these debts at substantial discounts, claiming they would resolve a typical consumer's debt for between 30% to 70% of the amount owed within 18, 24, or 36 months. Defendants' claims include:

    a.  "In as little as 18 months become debt free and enjoy financial independence."

    b.  "Based upon what you are able to pay each month in your settlement account, we can determine how many months you will be part of the program, and ultimately be debt free."

    c.  "Okay (client's name), you'd be looking at resolving your total debt of (see worksheet) for a resolution amount of approximately (see worksheet), you'd be debt free in (see worksheet) months or less."

    d.  "On average, Debt Pro will reduce a Client's total debt by 70 to 80 percent on average including all fees."

    e.  "With settlements as low as 10%, this means when all is said and done, a client's savings could be as much as 20 cents on the dollar including our fees."

    f.  "DebtPro123 works diligently and professionally with your creditors on your behalf to reduce your current unsecured debt down 10-30% by arbitrating an agreed settlement amount with your creditors."

    g.  "With honest and informative advice, outstanding customer service, and a proven debt settlement process we can ensure our

9

1  clients become debt free quickly and comfortably and get back on
2  the path of financial freedom."

3  25.  Defendants reinforced these claims with their "Debt Calculator."  The
4  Debt Calculator showed an individual consumer's debt and set forth the amount a
5  consumer must pay to resolve his debts.  The Debt Calculator set out a payment
6  schedule and set forth how much of each payment Defendants kept for "fees" and
7  "processing" and how much they promised to put aside in the "Creditor Fund" or a
8  "Settlement Account" to resolve the consumer's debt.  Defendants and their
9  affiliates told consumers that the consumer's Creditor Fund/Settlement Account
10  was similar to an escrow account.

11  26.  Defendants told consumers that there were two phases to the program.
12  In "Phase One," typically the first four months of the program, Defendants
13  represented that the consumer would build up the money in his Creditor
14  Fund/Settlement Account, which Defendants needed prior to any negotiations with
15  the consumer's creditors.  In "Phase Two," typically the remaining fourteen to
16  thirty-two months, Defendants stated, "this is usually the 'transitional period'
17  where the terms and conditions of the creditors are being changed."  Typically, the
18  consumer paid Defendants a smaller monthly payment in Phase Two than in Phase
19  One.  In both phases, however, the monthly payment consisted of both fees and
20  money for the consumer's Creditor Fund/Settlement Account.

21  27.  The materials Defendants created and distributed to affiliates and
22  consumers represented that Defendants' program was able to "obtain more
23  aggressive 'resolutions' than traditional Debt Settlement companies" because
24  Defendants had attorneys who provided legal services to the consumers.
25  Defendants repeatedly stated that their "Legal Department" and "legal in house
26  counsels" would analyze the consumers' debts and negotiate the terms of their
27  resolution.  For example:

28

10

a. "By working with our organization, you hire the attorneys directly."

b. "The attorneys will communicate directly with your creditors and debt collectors via the mail and telephone.  They will audit your bills and the collection methods being used by the creditors to determine if your consumer rights have been violated.  They will leverage their existing relationships with all of the major creditors to negotiate the best possible resolutions of your enrolled debts.  If necessary and applicable, the attorneys will sue your creditors on your behalf should a violation of your consumer rights be identified."

28.  Defendants also represented that they would improve consumers' credit:

a. "Upon completion of the process, most if not all negative or adverse items are REMOVED from clients all three major reporting credit bureaus."

b. "Expect some negatives on your credit report for about 18 months.  Mark you [sic] calendar 12 months ahead, when that day comes, pull a credit report on yourself from all three of the agencies and send them to us.  Because we changed the terms and conditions of the contract and made it more favorable for you we are able to get the negatives removed and your credit report corrected."

### *The Consumer Experience*

29.  As part of Defendants' enrollment process, consumers received Defendants' "Getting it Started" packet, which included a "Debt Resolution Agreement," and a sign-up form automatically allowing Defendants to withdraw funds from the consumer's checking or savings account.  Defendants typically required consumers to make all payments by automatic withdrawal.

11

30.     Defendants also sent consumers a "Welcome Packet" after the consumer had submitted the documents in the "Getting it Started" packet.  The "Welcome Packet" further described the program, giving the clients a payment schedule, a fee schedule, and additional instructions regarding creditor communications.

31.     At no point did Defendants provide any of the written disclosures required under the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679c. For instance, Defendants did not disclose that:  credit bureaus are permitted to report accurate information; consumers can obtain free credit reports; consumers can sue credit repair organizations for violating CROA; consumers can cancel any contract with a credit repair organization within 3 days of signing; credit bureaus are required to take steps to ensure they report only accurate information; and consumers can, on their own, challenge the accuracy of their credit report.

32.     Defendants charged their clients a nonrefundable fee.  The fee was a percentage of the amount of the debt that the consumer owed his unsecured creditors at the beginning of the program.  Since the program started, the fee increased from 10% to over 20% of the consumer's total debt.

33.     Defendants collected their fees as a portion of the monthly payments, front-loading the fees.  For many consumers, more than half of their monthly payment went towards Defendants' fees.  For consumers who were in the program longer than eighteen months, Defendants also charged a $49 monthly "maintenance fee."

34.     Defendants instructed consumers to stop paying their creditors and to stop all communications with their creditors.  Defendants further instructed consumers to keep a call log with the dates and times they received calls from their creditors.  Defendants told consumers that the phone log would help in negotiations because if Defendants could establish that the creditor had violated the Fair Debt Collection Practices Act, Defendants could use that as leverage to reduce

the consumer's debt.  Defendants also instructed consumers to send them all original correspondence from the creditors, including statements, collections letters, and lawsuits.

35.     Defendants told consumers that they could not make direct payments to their creditors in lieu of paying Defendants for the debt resolution program. Moreover, even if a consumer came into sufficient money to pay the remaining amount required to build up their Creditor Fund/Settlement Account in advance of their scheduled monthly payments, Defendants required the consumer to pay Defendants' fees for the entirety of the program before putting this money into the Creditor Fund/Settlement Account.

36.     Defendants required each consumer to submit a notarized "Limited Power of Attorney," in order to give Defendants the power to negotiate the consumer's debts on behalf of the consumer.  Defendants also required consumers to submit notarized Assignment of Debt forms for each of their debts, which Defendants represented would assign the liability of the debt to Defendants.

### *Defendants' Failure to Fulfill Their Promises*

37.     Despite their claims, Defendants did not reduce the typical consumer's debt for between 30% to 70% of the amount owed in the 18-36 months.

38.     In many instances, Defendants did not commence settlement negotiations immediately, or even at the start of Phase Two.  Instead, to the extent that Defendants initiated negotiations with any of their clients' creditors, they did not do so until after the consumer had received letters from creditors warning of an impending lawsuit for failure to make payments on their debts.

39.     To the extent Defendants negotiated a settlement on behalf of a consumer, they rarely, if ever, negotiated settlements with all of a consumer's creditors.

13

40.    Even when Defendants succeeded in negotiating a settlement on a consumer's account, the amount Defendants agreed to pay was, in many instances, significantly higher than 30% to 70% of the amount owed to the creditor at the time the consumer enrolled in Defendants' program.  Instead, Defendants agreed to pay the full amount owed, in installments over the course of a few months. Moreover, because Defendants always instructed consumers to cease paying their creditors upon enrollment, the total amount of the debt was usually higher than the amount the client owed the creditor at the time he or she enrolled in the program.

41.    Following any such settlement agreement with a creditor, Defendants immediately sent a letter or email to the consumer, informing him that the account was "resolved."  In many instances, however, Defendants failed to make all of the settlement's payments to the creditor.  In numerous instances, the creditor then sued, or re-sued, the consumer for failure to pay on the "resolved" debt.

42.    When consumers learned that Defendants had not resolved their accounts, they frequently requested a refund.  Defendants then created multiple obstacles to prevent and/or delay consumers' refund requests.  Defendants required clients to file a form that cancelled the contract in order to seek the return of any money, regardless of whether the consumer had paid all of the money owed as set forth in their Debt Calculator.  In addition, the consumers had to file a notarized Revocation of the Power of Attorney form and a notarized Revocation of the Assignment of Debt form for each account enrolled in the program.

43.    Even after consumers submitted all of these forms, and Defendants told them in emails and over the phone that a refund was forthcoming, in numerous instances, consumers received no refunds.

44.    After weeks of waiting, without response to their emails or receipt of a refund, some frustrated clients submitted complaints to their states' attorneys general or the Better Business Bureau, and Defendants again represented to these

agencies and organizations that a refund was forthcoming.  In numerous instances, however, Defendants failed to return any money to consumers.

45.    Regardless of whether Defendants resolved any of a consumer's debts, in many instances, Defendants kept all the money given to them by that consumer, including money earmarked for the consumer's Creditor Fund/Settlement Account.

46.    Therefore, Defendants failed to (a) ensure that the consumer continued to own the funds given to Defendants for purposes of fees and settelement; (b) give consumers any interest that accrued on the funds (to the extent that there was any interest); (c) allow the consumer to withdraw the funds they had given to Defendants without penalty; and (d) return to consumers all funds in the account, other than funds earned by Defendants, within seven days of a consumer's request.

47.    Despite Defendants' promises to provide "honest and informative advice" and "outstanding customer service," Defendants often failed to answer or even acknowledge consumers' telephone calls and emails.  Instead, consumers who wanted to know which accounts, if any, were resolved and how much money remained in their Creditor Fund/Settlement Account, had difficulty obtaining any accurate information from Defendants.

48.    Contrary to their claims, Defendants did not have a "Legal Department," "legal in house counsels," or any attorneys on staff.  Despite this, when creditors sued consumers for failure to pay their debts, Defendants sent the consumers legal "Answers" to file in court in response to their creditors' complaints.  Defendants instructed consumers to fill in their names, to sign the documents, and to pay the court filing fee.  In emails accompanying these documents, Defendants wrote, "[t]his filing is of the utmost importance for your case and if not done in the timeframe given a default judgment could be awarded against you for failure to comply."

15

49.     Despite Defendants' claims that they were "able to get the negatives removed" from consumers' credit reports, in many cases, negative information was not removed.  In addition, consumers' credit ratings were negatively impacted because they had ceased making any payments to their creditors for the course of the program.

50.     As a result of Defendants' actions, many consumers who retained Defendants' services for the purpose of improving their financial situation experienced such a substantial increase in their debt that they lost their homes, had their wages garnished, lost their entire retirement savings and/or filed for protection under the bankruptcy laws.

51.     Defendants have taken more than $8,000,000 from consumers.

## VIOLATIONS OF THE FTC ACT

52.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

53.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

54.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their debt resolution program, Defendants or their agents have represented, directly or indirectly, expressly or by implication, that:

a. Defendants' debt resolution program would resolve all of the typical consumer's debts enrolled in the program by the time that consumer completed the program.

b. Defendants would resolve the typical consumer's debt for a fraction of what that consumer owed to his creditors, such as 30% to 70% of the total amount owed.

16

c. Defendants had attorneys who would provide legal services to consumers.

d. Defendants' debt resolution program would improve the typical consumer's credit record, credit history, or credit rating, including by removing consumers' negative items.

e. Defendants had resolved specific accounts.

f. Defendants would provide refunds.

55. In truth and in fact, in numerous of these instances:

a. Defendants' debt resolution program did not resolve all of the typical consumer's debts enrolled in the program by the time that consumer completed the program.

b. Defendants did not resolve the typical consumer's debt for a fraction of what that consumer owed to his creditors, such as 30% to 70% of the total amount owed.

c. Defendants did not have attorneys providing legal services to consumers.

d. Defendants' debt resolution program did not improve the typical consumer's credit record, credit history, or credit rating, nor did it remove consumers' negative items.

e. Defendants had not resolved specific accounts.

f. Defendants did not provide refunds.

56. Therefore, the making of the representations, as set forth in Paragraph 54 of this Complaint, constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

57. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of their debt resolution program, Defendants or their agents represented, directly or indirectly, expressly or by implication, that

17

Defendants possessed and relied upon a reasonable basis that substantiated the representations set forth in Paragraph 54(a), (b), and (d) of this Complaint at the time the representations were made.

58.   In truth and in fact, Defendants did not possess and rely upon a reasonable basis that substantiated the representations set forth in Paragraph 54(a), (b), and (d) of this Complaint at the time the representations were made. Therefore, the making of the representations set forth in Paragraph 57 of this Complaint, constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

59.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their debt resolution program, Defendants have distributed to affiliates promotional materials that contained false and misleading representations, including but not limited to the false or unsubstantiated representations described in Paragraph 54(a)-(d) of this Complaint. In so doing, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

60.   Therefore, Defendants' practices, as described in Paragraph 59 of this Complaint, constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

61.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

62.   The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication, in the sale of goods or services, any material aspect of

18

1  the performance, efficacy, nature, or central characteristics of the goods or services

2  that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

3       63.    In 2010, the FTC amended the TSR to address the telemarketing of

4  debt relief services.  The amendments, effective September 27, 2010, prohibit

5  sellers or telemarketers from misrepresenting, directly or by implication, in the sale

6  of goods or services, any material aspect of any debt relief service, including, but

7  not limited to, the amount of money or the percentage of the debt amount that a

8  customer may save by using such service; the amount of time necessary to achieve

9  the represented results; the amount of money or the percentage of each outstanding

10 debt that the customer must accumulate before the provider of the debt relief

11 service will initiate attempts with the customer's creditors or debt collectors or

12 make a bona fide offer to negotiate, settle, or modify the terms of the customer's

13 debt; the effect of the service on a customer's creditworthiness; the effect of the

14 service on collection efforts of the customer's creditors or debt collectors; the

15 percentage or number of customers who attain the represented results; and whether

16 a debt relief service is offered or provided by a non-profit entity.  16 C.F.R. §

17 310.3(a)(2)(x).

18      64.    Separate amendments effective October 27, 2010, prohibit sellers and

19 telemarketers from requesting or receiving payment of any fees or consideration

20 for any debt relief service until and unless:

21          a.  The seller or telemarketer has renegotiated, settled, reduced, or

22              otherwise altered the terms of at least one debt pursuant to a

23              settlement agreement, debt management plan, or other such valid

24              contractual agreement executed by the customer;

25          b.  The customer has made at least one payment pursuant to that

26              settlement agreement, debt management plan, or other valid

27              contractual agreement between the customer and the creditor or

28              debt collector; and

c.  To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

    i.  Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.  The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

    ii.  Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  The percentage charged cannot change from one individual debt to another.  The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).

65.  The amendments effective October 27, 2010, permit sellers and telemarketers to request or require the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of debt, provided that:  (A) the funds are held in an account at an insured financial institution; (B) the customer owns the funds held in the account and is paid accrued interest on the account, if any; (C) the entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service; (D) the entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and (E) the customer may withdraw from the debt relief service at any time without penalty, and must receive

1   all funds in the account, other than funds earned by the debt relief service in

2   compliance with § 310.4(a)(5)(i)(A)-(C), within seven business days of the

3   customer's request.  16 C.F.R. § 310.4(a)(5)(ii).

4       66.    Defendants are "seller[s]" or "telemarketer[s]" engaged in

5   "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).

6   Under the TSR, a "telemarketer" means any person who, in connection with

7   telemarketing, initiates or receives telephone calls to or from a customer or donor.

8   16 C.F.R. § 310.2(cc).  A "seller" means any person who, in connection with a

9   telemarketing transaction, provides, offers to provide, or arranges for others to

10  provide goods or services to a customer in exchange for consideration.  *Id.* §

11  310.2(aa).

12      67.    Defendants are also sellers or telemarketers of "debt relief services" as

13  defined by the TSR, 16 C.F.R. § 310.2(m).

14      68.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C.

15  § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation

16  of the TSR constitutes an unfair or deceptive act or practice in or affecting

17  commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

18  <u>**COUNT IV**</u>

19      69.    In numerous instances, in connection with the telemarketing of goods

20  and services, Defendants misrepresented, directly or indirectly, expressly or by

21  implication, material aspects of the performance, efficacy, nature, or central

22  characteristics of such goods and services, including, but not limited to:

23      a.  Defendants' debt resolution program would resolve all of the

24          typical consumer's debts enrolled in the program by the time that

25          consumer completed the program.

26      b.  Defendants would resolve the typical consumer's debt for a

27          fraction of what that consumer owed to his creditors, such as 30%

28          to 70% of the total amount owed.

c. Defendants had attorneys who would provide legal services to their debt resolution clients.

d. Defendants' debt resolution program would directly or indirectly improve the typical consumer's credit record, credit history, or credit rating.

70.    Defendants' acts and practices, as described in Paragraph 69 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(iii) of the TSR.  16 C.F.R. § 310.3(a)(2)(iii).

### COUNT V

71.    In numerous instances on or after September 27, 2010, in connection with the telemarketing of debt relief services, Defendants misrepresented, directly or indirectly, expressly or by implication, material aspects of the debt relief services, including, but not limited to:

a. Defendants' debt resolution program would resolve all of the typical consumer's debts enrolled in the program by the time that consumer completed the program.

b. Defendants would resolve the typical consumer's debt for a fraction of what that consumer owed to his creditors, such as 30% to 70% of the total amount owed.

c. Defendants had attorneys who would provide legal services to their debt resolution clients.

d. Defendants' debt resolution program would directly or indirectly improve the typical consumer's credit record, credit history, or credit rating.

72.    Defendants' acts and practices, as described in Paragraph 71 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR.  16 C.F.R. § 310.3(a)(2)(x).

22

## COUNT VI

73.     In numerous instances on or after October 27, 2010, in the course of telemarketing debt relief services, Defendants requested or received payment of a fee or consideration for debt relief services:

    a.  before (1) they had renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (2) the customer had made at least one payment pursuant to that agreement; and/or

    b.  when, to the extent that debts enrolled in a service were renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) did not bear the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bore to the entire debt amount, or (2) was not a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration and that percentage did not change from one individual debt to another; and/or

    c.  when, to the extent consumer funds were held in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt, (1) the consumer did not own the funds held in the account; (2) the consumer was not paid any interest that accrued on his or her funds held in the account; (3) the consumer was not able to withdraw the funds from the debt relief service at any time without penalty; and/or (4) the consumer did not receive all the funds in the account, other than funds earned by the debt

23

relief service in compliance with § 310.4(a)(5)(i)(A)-(C), within seven business days of the consumer's request.

74.     Defendants' acts or practices, as described in Paragraph 73 of this Complaint, are abusive telemarketing acts or practices that violate section 310.4(a)(5) of the TSR. 16 C.F.R. § 310.4(a)(5).

**VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT**

75.     The purposes of CROA, according to Congress, are:

(1) To ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b).

76.     Defendants use instrumentalities of interstate commerce or mails to communicate with consumers and creditors.

77.     Defendants sell, provide or perform (or represent that they can or will sell, provide, or perform) services in return for payment of money for the express or implied purpose of improving consumers' credit record, credit history, or credit rating.

78.     Therefore, Defendants are "credit repair organizations" as that term is defined in CROA, 15 U.S.C. § 1679a(3).

79.     CROA prohibits credit repair organizations from charging or receiving any money or other valuable consideration for services that the credit repair organization has agreed to perform before such service is fully performed. 15 U.S.C. § 1679b(b).

80.     CROA prohibits all persons from making or using any untrue or misleading representation of the services of the credit repair organization. 15 U.S.C. § 1679b(a)(3).

81.     CROA requires credit repair organizations to provide any consumer with specific written disclosures prior to the execution of any contract or agreement between the consumer and the credit repair organization. 15 U.S.C. § 1679c.

82.     Pursuant to Section 410(b)(1) of CROA, 15 U.S.C. § 1679h(b)(1), any violation of any requirement or prohibition of CROA constitutes an unfair and deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT VII**

83.     In numerous instances, in connection with the performance of services for consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants or their agents have charged or received money or other valuable consideration for the performance of services that the credit repair organization has agreed to perform before such service was fully performed.

84.     Therefore, Defendants' acts or practices, as described in Paragraph 83 of this Complaint, violated Section 404(b) of CROA, 15 U.S.C. § 1679b(b).

**COUNT VIII**

85.     In numerous instances, in connection with the performance of services for consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants or their agents have misrepresented the services that they can provide as a credit repair organization, by stating that Defendants' debt resolution program would improve the typical consumer's credit record, credit history, or credit rating, including by removing consumers' negative items.

86.     Pursuant to the Fair Credit Reporting Act ("FCRA"), credit-reporting agencies are permitted to report accurate negative information such as late payments, charge-offs, collections, judgments, and garnishments for seven years.

25

15 U.S.C. § 1681c.  The FCRA also prohibits creditors from knowingly reporting false information, 15 U.S.C. § 1681s-2(a)(1), and thus prohibits creditors from changing accurate information they have previously reported.

87.     Therefore, Defendants' acts or practices, as described in Paragraph 85 of this Complaint, violated Section 404(a)(3) of CROA, 15 U.S.C. § 1679b(a)(3).

## COUNT IX

88.     In numerous instances, in connection with the performance of services for consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants or their agents have failed to provide to the consumer the required written disclosures that they must give to consumers as a credit repair organization, prior to the execution of any contract or agreement.

89.     Therefore, Defendants' acts or practices, as described in Paragraph 88 of this Complaint, violated Section 405 of CROA, 15 U.S.C. § 1679c.

## CONSUMER INJURY

90.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and CROA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

91.     Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and Section 410(b) of the Credit Repair Organizations Act, 15 U.S.C. § 1679h(b), empower this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

### PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), Section 410(b) of CROA, 15 U.S.C. § 1679h(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act, the TSR and CROA by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and CROA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.


Respectfully submitted,

Jonathan E. Nuechterlein
General Counsel


Dated:  5 / 1 / 14

Benjamin J. Theisman
Miriam R. Lederer
Federal Trade Commission
600 Pennsylvania Ave., NW
Maildrop M-8102B
Washington, DC 20580
202-326-2223 (Theisman)

202-326-2975        (Lederer)

Stacy Procter  (Local Counsel)
CA Bar No. 221078
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA  90024
Tel: 310-824-4343


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| Federal Trade Commission | DebtPro 123 LLC, a limited liability company, (See attachment for a complete list of all Defendants) |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant   Orange County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| (See attachment) | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. 45; 16 C.F.R. Part 310 et seq.; 15 U.S.C. 1679 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | **SACV 14 - 00693 JLS (ANx)** |
|---|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court?<br><br>☐ Yes  ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action?<br><br>☒ Yes  ☐ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☒ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims?<br>(Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| **C.1.  Is either of the following true?  If so, check the one that applies:**<br><br>☐ 2 or more answers in Column C<br><br>☐ only 1 answer in Column C and no answers in Column D<br><br>Your case will initially be assigned to the<br>SOUTHERN DIVISION.<br>Enter "Southern" in response to Question D, below.<br><br>If none applies, answer question C2 to the right. ➡ | **C.2.  Is either of the following true?  If so, check the one that applies:**<br><br>☐ 2 or more answers in Column D<br><br>☐ only 1 answer in Column D and no answers in Column C<br><br>Your case will initially be assigned to the<br>EASTERN DIVISION.<br>Enter "Eastern" in response to Question D, below.<br><br>if none applies, go to the box below. ⬇ |
|---|---|

| Your case will initially be assigned to the<br>WESTERN DIVISION.<br>Enter "Western" in response to Question D below. |
|---|

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Southern |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a).  IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):  _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):  _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X.  SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**  _____   DATE: 5/1/14

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

JONATHAN E. NUECHTERLEIN (General Counsel)
BENJAMIN J. THEISMAN
MIRIAM R. LEDERER
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW, M-8102B
Washington, DC 20580
Tel: 202-326-2223 (Theisman); 202-326-2975 (Lederer)
Email: btheisman@ftc.gov; mlederer@ftc.gov

STACY PROCTER (Local Counsel)
CA Bar No. 221078, sprocter@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Boulevard, Suite 700
Los Angeles, CA 90024
Tel: 310-824-4343; Fax: 310-824-4380

Attorneys for Plaintiff FTC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>    Plaintiff,<br><br>    v.<br><br>DEBTPRO 123 LLC, a limited liability company,<br><br>ALLSTAR PROCESSING CORP., a corporation,<br><br>ALLSTAR DEBT RELIEF LLC, a Texas limited liability company,<br><br>ALLSTAR DEBT RELIEF LLC, a California limited liability company, | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

1

REDWAVE MANAGEMENT GROUP,
INC., a corporation,

BET COMPANIES, INC., also d/b/a
DebtPro 123, a corporation,

and

BRYAN E. TAYLOR, a/k/a B. Edward
Taylor, individually and as an officer of
DEBTPRO 123 LLC, ALLSTAR
PROCESSING CORP., ALLSTAR DEBT
RELIEF LLC (TX), REDWAVE
MANAGEMENT GROUP, INC., and BET
COMPANIES, INC.,

RYAN FOLAND, a/k/a R. Eugene Foland,
individually and as an officer of
DEBTPRO 123 LLC, ALLSTAR
PROCESSING CORP., ALLSTAR DEBT
RELIEF LLC (TX), and REDWAVE
MANAGEMENT GROUP, INC.,

STACEY FRION, individually and as an
officer of REDWAVE MANAGEMENT
GROUP, INC.,

KARA TAYLOR, a/k/a Kara Wilbur, a/k/a
Kara Lynn, individually and as an officer
of DEBTPRO 123 LLC, and REDWAVE
MANAGEMENT GROUP, INC.,

    Defendants.

    Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

    1.    The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing

2